*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

   Plaintiff-Appellee,

v

SCOTT KEVIN MEISTERHEIM,

   Defendant-Appellant.

UNPUBLISHED
August 06, 2025
2:37 PM

No. 363497
Kalamazoo Circuit Court
LC No. 2021-002288-FC

Before: FEENEY, P.J., and BORRELLO and LETICA, JJ.

PER CURIAM.

Following a jury trial, Scott Kevin Meisterheim, hereinafter "defendant," was convicted of aggravated domestic violence, MCL 750.81a(2). The jury also acquitted defendant of one count of first-degree criminal sexual conduct (personal injury) (CSC-I), MCL 750.520b(1)(f), and three counts of third-degree criminal sexual conduct (force or coercion) (CSC-III), MCL 750.520d(1)(b). The trial court sentenced defendant to 228 days in jail, with credit for 228 days served, and 18 months' probation. Subsequently, defendant's probation was revoked and he was sentenced to serve 330 days in jail with credit for 229 days served. He was also ordered to pay $24,684.21 in restitution. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

This case arises out of incidents between defendant and the victim, hereinafter DS, that were alleged to have occurred over the course of multiple days from December 23 to 25, 2021. DS and defendant were married on September 10, 2021, after having been in "an on and off relationship [for] probably over 10-years."

DS testified that on December 23, 2021, she and defendant had an argument while driving in a car. DS was driving, and defendant was riding in the passenger seat. At some point during this argument, DS pulled over to the side of the road. Defendant grabbed the steering wheel and DS's hands, and he bent her right index finger back, causing her to scream.

The next evening, December 24, DS and defendant had another argument at home. DS testified that defendant had consumed alcohol at various times during the day, including while

-1-

some friends were visiting from approximately 5:00 p.m. to 5:45 p.m. According to her, after their friends had left, defendant expressed interest in "adopting his third child" and "paying back child support." Defendant was also upset that their friends had left early. DS also told defendant that she "didn't want to raise his daughter." Defendant became angry and went downstairs, with DS following him.

In her trial testimony, DS described the events that followed. Defendant lit a cigarette, went outside, and "slammed the sliding glass door hard." DS testified that she tried to talk to defendant, but he opened the sliding door and slammed it closed again. She testified that she then "opened up, pushed him back and said do not destroy our house in this rage; don't do it." DS described defendant's escalating violence in the following exchange with the prosecutor:

> *Q.* How did he react when you redirected him back inside the house?
>
> *A.* He just suddenly grabbed me by the neck. Picked me up. Threw me into the sliding glass door.
>
> *Q.* Now, you say that he grabbed you by the neck. How did he grab you by the neck? Do you remember which hand he used?
>
> *A.* I was facing him. He grabbed me with--it felt like both hands. I know his left hand went around my neck. And, then I felt the other hand as I went up against that door.
>
> *Q.* Did he apply pressure while he had his hands around your neck?
>
> *A.* Oh, yeah.
>
> *Q.* Did you at any point end up having trouble breathing?
>
> *A.* I--I knew I was in trouble, but it was happening so fast. I was in shock and I was scared.
>
> &ast; &ast; &ast;
>
> *Q.* What did you think was going to happen?
>
> *A.* I was going to go through the plate glass window and be very injured.
>
> *Q.* Now, you did indicate before we were talking about kind of his hands on his (sic) neck, that he also slammed you against the glass door. How did you-- what part of your body hit the door?
>
> *A.* The left side of my face.
>
> &ast; &ast; &ast;
>
> *Q.* Could you just also, because we're recorded, but it's mostly audio recording, describe specifically what part of your head was--.

*A.* Yes. My left mandible, the outer edge of my left eye and the left side of my head proximal to my left ear.

*Q.* Now, taking a step back for a second. You are using some very specific language. What is your profession?

*A.* I'm a registered nurse.

*Q.* So, far [sic] to say you're familiar with technical terms for different body parts and injuries and things like that?

*A.* Yes.

*Q.* Now, what happen after you were thrown against the glass door by [defendant]?

*A.* It happened super quick. I rebound and I came back over. And, we had a sectional sofa. Ottoman was in the middle, and I came back and hit the ottoman. The wheels kind of came out and I just plopped on the floor.

*Q.* And, did--did the assault stop at that point?

*A.* Yes.

DS testified that she remained conscious but was "very stunned." She received injuries to the left side of her jaw, the bridge of her nose, and her septum. DS also testified that she "felt" like she had a concussion, that she vomited, and that she had a headache. Defendant left after the assault.

Defendant returned home the next morning. By that point, DS's face was "swollen and injured," and her gums were bleeding. Defendant told DS to make breakfast, and she complied.

DS testified that later that evening, defendant sexually assaulted her. DS essentially indicated that defendant demanded sexual intercourse from her and that she complied because she did not feel like she had a choice. She also testified that defendant ignored her when she told him to stop and that defendant told her that "this was part of [her] punishment." DS described how defendant penetrated her vaginally and anally using his penis, fingers, hands, and a "pink dildo."[1] This alleged assault ended by approximately 8:20 p.m.

At approximately 2:00 a.m., DS left the house and went to the emergency room. DS testified, "My jaw was pretty bad. The bruising or ecchymosis and swelling was horrendous."

---

[1] Because defendant was acquitted of the CSC charges, further details from DS's testimony about this conduct are not relevant to the resolution of this appeal. We also will not discuss other evidence and trial arguments pertaining only to the alleged sexual assaults unless necessary for resolution of the issues presented on appeal related to the aggravated domestic assault conviction

-3-

DS further testified about her injuries. Regarding injuries to her hand from the December 23 incident, she suffered "a sprain, bruising, swelling, irritation to some arthritis . . . in that hand." When asked if she had healed from that injury, DS responded, "I just [have] more arthritis now and I have a little impaired grip. We're working on it in physical therapy[.]" With respect to the December 24 incident, DS testified that in addition to the swelling on her jaw, she was diagnosed with a deviated septum and experienced problems with sinus drainage after the assault. DS also testified that as a result of defendant grabbing her neck, she had a "scratchy throat" and "bruising and swelling to that area for almost 3[-] months." Finally, DS testified about physical injuries she incurred from the sexual assault that included bleeding from her rectum and chronic pain. Pictures of DS's injuries from near the time of the assaults were admitted into evidence and shown to the jury. By the time of trial, DS and defendant were divorced.

Defendant's trial counsel cross-examined DS specifically about discussions she had with her best friend, Tina Smith. DS communicated with Smith by phone and text messaging during the night of December 24, after defendant left the house following the physical assault. DS had paid for the house in which she and defendant lived, and she admitted in her cross-examination that she was worried about losing her assets in a divorce. DS admitted that she had sent text messages to Smith, after the physical assaults and before the sexual assaults occurred, stating that DS was worried that defendant was "going to try and take half and leave," that DS and Smith would "work on plan B," and that DS was going to "get a lawyer." DS admitted that "at some point," she told Smith that she was "thinking ER rape assault." (Tr I, 250-254.) DS declined a sexual assault examination when she went to the emergency room on the night of the assaults, but she did undergo a sexual assault examination a few days later.

On redirect, DS explained that "plan B" was how she and Smith referred to their longstanding dreams of having a farm. DS also clarified that she told Smith that she was "thinking ER rape assault" after the sexual assaults occurred.

Dr. Colleen Howing, a third-year resident in emergency medicine, testified as an expert in "the field of medicine." She treated DS in the emergency room on December 26, 2021. According to Dr. Howing, DS had "visual facial injuries, including swelling, bruising, what we call eechymosis [sic] in the medical field, to her face." DS also had "bruising on other aspects of her body," her "buttock," and mild swelling on her hand.

Deputy Kameron Snyder, from the Kalamazoo County Sheriff's Office, testified that he spoke to DS at the hospital on the morning of December 26, 2021. DS provided a statement about what had occurred over the past three days. Snyder described DS's demeanor as "[v]ery hesitant," and "[v]ery emotional, embarrassed." Snyder also testified that observed injuries that DS had incurred, which included "Visible injury on the left side of her face on her cheek and her chin area," as well as "Swelling, black and blue." He also stated, "the inside of her lip she showed me was to be busted up and bloody on the inside."

Defendant testified in his own defense. With respect to the incident on December 23, defendant testified that the argument began before he and DS started driving. Defendant admitted that he became upset with DS because he thought she was making them late for an appointment with defendant's client. He made some negative comments about her outfit, and she shoved him, hit him on the chest, and cursed at him. According to defendant, DS hurt her hand because she

-4-

made a sudden turn while she was driving at 55 miles per hour, turned into a parking lot, stopped suddenly while pulling into a parking spot, and hit her hand on the dashboard as it came off the gear shifter. He denied grabbing or snatching DS's hand.

Defendant also denied that he was drinking throughout the day on December 24, and he stated that he did not drink any alcohol until after approximately 5:30 p.m. Defendant testified that DS had been drinking. According to defendant, he showed DS a picture of his daughter and DS began insulting the mother of defendant's daughter. Defendant became upset and told DS to shut her "f-ing mouth." They continued arguing outside. Defendant described the physical part of the altercation as follows on direct examination by his trial counsel:

> *A.* . . . So, I loaded my arms full of firewood and as I'm doing that, she slamming the door. I heard her slam the sliding glass door. And, I walk in the house into the basement and there [she] is right there in my face. And, that's when she shoved me. She shoved me back against the door as I closed it.

> *Q.* So, when she testified yesterday that she came down the stairs and she pushed--hit you or something like that – that was part was true?

> *A.* That's--yes, that part is true.

> *Q.* Okay.

> So, what happen from there?

> *A.* From there she got me two good clicks in the ear. She loves to swing. She's a puncher. And, on the second one, I put my arm out and I pushed her away.

> *Q.* Okay.

> So, you pushed her away. Extended your arm and pushed her off you?

> *A.* Yes.

> *Q.* And, then what happen as a result of that?

> *A.* She fell onto the coffee table. And, I was--when I pushed her away, I went over and set the firewood down at the fireplace and all I heard was a crash.

> *Q.* Okay.

> *A.* I heard all the glasses that are on the coffee table—I heard the drinks spill on the carpet. Sadly, I was only concerned about the vodka and the ginger beer and the brand new carpet. I didn't really care if she was hurt or not.

> *Q.* Okay.

> Did you say--did you say anything to her?

*A.* I did. I said, that's--that's the last straw. Now I'm out of here. I'm leaving. I didn't care that she was moaning--that she was in pain. I just had enough and I just wanted to go.

*Q.* At that time did you know if she was injured or how bad?

*A.* I did not.

*Q.* You didn't see her face?

*A.* I did not.

Defendant left, and he ignored DS's phone calls. The next morning, defendant returned and talked with DS. He denied sexually assaulting her in any manner.

As previously stated, the jury convicted defendant of aggravated domestic violence and acquitted defendant of the four CSC charges.

Defendant filed a claim of appeal. Subsequently, defendant filed a motion for a new trial in the trial court. As relevant to the issues now before this Court on appeal, defendant argued in the trial court that his aggravated domestic assault conviction was not supported by sufficient evidence because there was insufficient evidence to establish a serious or aggravated injury, and defendant also argued that his trial counsel was ineffective on multiple grounds. After holding an evidentiary hearing, the trial court denied defendant's motion for a new trial.

## II. ANALYSIS

On appeal, defendant challenges the sufficiency of the evidence supporting his conviction and argues that he received ineffective assistance of counsel based on numerous alleged errors in his counsel's representation. We address each of these arguments in turn.

## A. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that his aggravated domestic violence conviction was not supported by sufficient evidence because there was insufficient evidence to establish beyond a reasonable doubt that DS suffered a serious or aggravated injury, which is a necessary element for this offense.

"Due process requires that the evidence show guilt beyond a reasonable doubt in order to sustain a conviction." *People v Unger*, 278 Mich App 210, 222; 749 NW2d 272 (2008). When addressing a claim that the prosecution did not present sufficient evidence to sustain a conviction, an appellate court "must consider not whether there was any evidence to support the conviction but whether there was sufficient evidence to justify a rational trier of fact in finding guilt beyond a reasonable doubt." *People v Wolfe*, 440 Mich 508, 513-514; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992) (quotation marks and citation omitted). "The sufficient evidence requirement is a part of every criminal defendant's due process rights," and it "is an attempt to give 'concrete substance' to those rights, by precluding irrational jury verdicts." *Id*. at 514 (citation omitted). An appellate court reviewing a sufficiency claim "must view the evidence in a light most

favorable to the prosecution and determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *Id*. at 515.

Moreover, "[t]he standard of review is deferential: a reviewing court is *required* to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018) (quotation marks and citation omitted; alteration in original). "It is the jury's task to weigh the evidence and decide which testimony to believe." *Unger*, 278 Mich App at 222 (quotation marks and citation omitted). "All conflicts in the evidence must be resolved in favor of the prosecution and we will not interfere with the jury's determinations regarding the weight of the evidence and the credibility of the witnesses." *Id*. "The scope of review is the same whether the evidence is direct or circumstantial. Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *Oros*, 502 Mich at 239 (quotation marks and citation omitted).

At the time of defendant's trial, MCL 750.81a(2), as amended by 2012 PA 366,[2] provided in relevant part as follows:

> [A]n individual who assaults his or her spouse or former spouse, an individual with whom he or she has or has had a dating relationship, an individual with whom he or she has had a child in common, or a resident or former resident of the same household without a weapon and inflicts serious or aggravated injury upon that individual without intending to commit murder or to inflict great bodily harm less than murder is guilty of a misdemeanor punishable by imprisonment for not more than 1 year or a fine of not more than $1,000.00, or both.

Thus, to sustain a conviction for this offense under the factual circumstances of this case, the prosecution was required to prove that (1) DS was defendant's spouse, (2) defendant assaulted DS, and (3) the assault caused "serious or aggravated injury." MCL 750.81a(2). "An assault may be established by showing either an attempt to commit a battery or an unlawful act that places another in reasonable apprehension of receiving an immediate battery." *People v Starks*, 473 Mich

---

[2] The current version of MCL 750.81a(2), as amended by 2023 PA 271, provides in relevant part as follows:

> [A]n individual who assaults the individual's spouse or former spouse, an individual with whom the individual has or has had a dating relationship, an individual with whom the individual has had a child in common, or a resident or former resident of the same household without a weapon and inflicts serious or aggravated injury upon that individual without intending to commit murder or to inflict great bodily harm less than murder is guilty of a misdemeanor punishable by imprisonment for not more than 1 year or a fine of not more than $1,000.00, or both.

The changes in language do not have any impact under the circumstances of this case. All future references to MCL 750.81a(2) in this opinion will be to the former version of the statute that was in effect at the time of defendant's trial unless otherwise stated.

227, 234; 701 NW2d 136 (2005). "Battery has been defined as an intentional, unconsented and harmful or offensive touching of the person of another, or of something closely connected with the person." *Id*. (quotation marks and citation omitted).

This Court has held that "serious or aggravated injury" for purposes of MCL 750.81a is defined as a "substantial bodily (physical) injury or injury that necessitated immediate medical treatment or caused disfigurement, impairment of health or impairment of any bodily part." *People v Brown*, 97 Mich App 606, 611; 296 NW2d 121 (1980) (quotation marks and citation omitted); accord *People v Norris*, 236 Mich App 411, 415 n 3; 600 NW2d 658 (1999) (citing *Brown* for this definition of serious injury for purposes of MCL 750.81a).

Defendant's appellate argument asks this Court to engage in weighing the evidence and witness credibility anew, contrary to the standard of review. *Unger*, 278 Mich App at 222. To the extent there was conflicting evidence, it is resolved in the prosecution's favor. *Id*. Furthermore, contrary to defendant's assertion, there is no requirement that the injury must be permanent to qualify as a serious or aggravated injury. See *Brown*, 97 Mich App at 611; cf also *Norris*, 236 Mich App at 418-419 (holding that injuries that were not permanent could constitute serious injuries for purposes of demonstrating that a weapon was a "dangerous weapon" within the meaning of the armed robbery statute). Rather, than engage in weighing the evidence, our review of the record reveals that contrary to defendant's assertions on appeal, there was sufficient, credible testimony that defendant picked DS up by her neck and threw her into a sliding glass door and that they were married at the time of the incident. A rational trier of fact could have reasonably found that defendant committed an assault against his spouse. MCL 750.81a(2); *Starks*, 473 Mich at 234. Defendant does not appear to contest that those two elements were satisfied, instead focusing on whether a serious or aggravated injury was shown. However, there was trial testimony that as a result of the physical assault by the sliding glass door, DS suffered extensive swelling and bruising to her left jaw and the left side of her face, prolonged bruising and swelling on her neck, a split lip, bleeding gums, and a deviated septum. She also testified that her throat was "scratchy" right for months. The jury was also shown pictures of these injuries.

Viewing this evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that DS suffered a serious or aggravated injury as a result of the assault by defendant. *Wolfe*, 440 Mich at 515; *Brown*, 97 Mich App at 611. Defendant's conviction was supported by sufficient evidence. See *Brown*, 97 Mich App at 611 (holding that there was sufficient evidence that the victim received a serious or aggravated injury where there was testimony that the victim was rendered unconscious by the blow to the head, hit his head on concrete, suffered cuts on his face, incurred an eye injury, and had a bruised neck, even though the victim did not seek medical attention until the following evening).

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Next, defendant argues that he received ineffective assistance of counsel based on his trial counsel's failure to impeach DS's credibility and refute her testimony. Defendant identifies several alleged deficiencies in his trial counsel's performance.

An ineffective assistance of counsel claim is preserved by moving in the trial court for a new trial or an evidentiary hearing. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012).

-8-

Defendant did so in this case, and the trial court held an evidentiary hearing to address defendant's ineffective assistance of counsel claims. These arguments are therefore preserved. *Id*.

"Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law. A judge first must find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). "This Court reviews findings of fact for clear error and questions of law de novo." *Heft*, 299 Mich App at 80.

"Under *Strickland v Washington*, [466 US 668, 688; 104 S Ct 205; 280 L Ed 2d 674 (1984),] establishing ineffective assistance requires a defendant to show (1) that trial counsel's performance was objectively deficient, and (2) that the deficiencies prejudiced the defendant." *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018). For the first prong, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 US at 688. Regarding the second prong, "[p]rejudice means 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Randolph*, 502 Mich at 9, quoting *Strickland*, 466 US at 694.

As an initial matter, it is evident from the nature of defendant's appellate arguments and his arguments in the trial court on his motion for a new trial that defendant's primary postconviction focus has been to second-guess a myriad of decisions by his trial counsel and relitigate his trial with a modified strategy that defendant believes would have resulted in acquittal on all charges. Although "a court cannot insulate the review of counsel's performance by calling it trial strategy," *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012), we find guidance from the United States Supreme Court in *Strickland* in addressing defendant's arguments:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. [*Strickland*, 466 US at 689 (citations omitted).]

Moreover, with respect to prejudice, the *Strickland* Court stated:

It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding. [*Id*. at 693 (citation omitted).]

Here, defendant argues that his trial counsel was ineffective for failing to use a forensic pathologist or physiologist to testify as an expert regarding the mechanism of DS's injury. Defendant maintains that DS's injury could not have been caused by hitting the slider door as she testified and must have been caused by falling on the coffee table as defendant testified. Defendant relies on the evidentiary hearing testimony of Dr. Keith Button, an engineer, in which Dr. Button opined that the torque necessary to lift DS off the floor as she claimed was beyond normal human capabilities.

However, even assuming defendant could have convinced the jury through an expert witness that DS's facial injuries were the result of contact with some object other than the slider door, it is unclear how defendant could establish the requisite prejudice. As previously discussed, there was sufficient evidence that DS suffered a serious or aggravated injury as a result of being assaulted by her spouse. Even if the jury only accepted defendant's admitted version of the incident, that would establish that he pushed her, she fell and hit her face on the coffee table, and she incurred the serious injuries. Defendant also admitted in the evidentiary hearing that DS did not have the bruises or injuries on her face before this incident. Moreover, given that DS was recalling the events of a violent assault, it seems unlikely that an inaccuracy in the precise mechanism of her injury would have had much effect on the jury's view of her credibility. Defendant has not shown that there is a reasonable likelihood that but for the lack of his proposed expert testimony, the result of defendant's trial would have been different. *Randolph*, 502 Mich at 9.

For the same reasons, defendant's trial counsel was not ineffective for failing to request expert assistance for trial at public expense. To be entitled to an expert at public expense, "a defendant must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial." *People v Kennedy*, 502 Mich 206, 228; 917 NW2d 355 (2018). Defendant has failed to demonstrate on appeal that this showing could have been made and thus has not shown that his trial counsel was ineffective on this basis. *Randolph*, 502 Mich at 9.

Moreover, defendant's reliance on *People v Ackley*, 497 Mich 381; 870 NW2d 858 (2015), is misplaced. The factual circumstances in *Ackley* involved the "unexplained and unwitnessed death of a child." *Id*. at 383. The defendant claimed to have discovered the three-year-old daughter of his girlfriend "lying unresponsive on the floor next to the bed" after she had been napping alone in her room. *Id*. at 384. The prosecution alleged that the defendant killed the child by either shaking or blunt force trauma. *Id*. The defendant attributed the death to an accidental fall and denied hurting the child. *Id*.

Lacking eyewitnesses and direct evidence, the prosecution built its case on expert testimony and presented five medical experts to testify at trial that the child's death was caused by "nonaccidental shaking, blunt force trauma, or a combination of both." *Id*. However, despite the

-10-

critical importance of expert testimony "to explain whether the cause of death was intentional or accidental" and despite that the court had provided the defense with funding for expert assistance, the defense did not call any experts to testify in support of the theory that the death was caused by an accidental fall. *Id*. at 383-384. The defendant's trial counsel had consulted one expert who indicated that his opinion would not assist the defense, and the defendant's trial counsel ignored that expert's referral to another expert who would have potentially been able to assist the defense in supporting the theory of an accidental death. *Id*. at 385-387. Our Supreme Court held that "defense counsel's failure to attempt to engage a single expert witness to rebut the prosecution's expert testimony, or to attempt to consult an expert with the scientific training to support the defendant's theory of the case, fell below an objective standard of reasonableness, and created a reasonable probability that this error affected the outcome of the defendant's trial." *Id*. at 383.

Here, there was testimony that DS's facial injuries were visible and obvious to people who saw her around the time of the assault; the prosecution's domestic assault case did not turn on the presentation of expert testimony or establishing the precise mechanism to explain the development of those injuries. Rather, there was testimony—including defendant's own admissions—that defendant physically assaulted DS and caused her to hit her face on an object, which in turn caused significant bruising and facial injury. As previously discussed, this evidence was sufficient to establish defendant's guilt with respect to the charge of aggravated domestic assault. Expert testimony explaining whether the injury was more likely attributable to contact with a coffee table or a slider door would not negate defendant's guilt under these circumstances. Thus, the factual circumstances present in this case are clearly distinguishable from those in *Ackley*.

Next, defendant argues that his trial counsel was ineffective for failing to call certain lay witnesses—specifically the individuals who defendant and DS saw on December 23 and 24 near the time of the incidents in question—to testify at trial that defendant was not intoxicated on the days of the events in question. Such testimony defendant asserts, would have shown that DS was lying about defendant's alcohol consumption. Defendant additionally argues that his trial counsel was ineffective for failing to impeach DS with text messages she sent to her friend indicating that defendant had not had "that much to drink." "Decisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy." *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). "Defense counsel is given wide discretion in matters of trial strategy because many calculated risks may be necessary in order to win difficult cases." *Unger*, 278 Mich App at 242.

Here, defendant's trial counsel, explained during the evidentiary hearing that his strategy was to minimize the focus on defendant's drinking, and he further explained that none of these particular witnesses were present during the actual assaultive incident for which defendant was charged. Moreover, although defendant claims that testimony that defendant was not intoxicated would have undermined DS's credibility, she already testified at trial that she was not certain how much alcohol defendant consumed that day. DS also testified that based on the empty bottles she found, she believed defendant had consumed two and a half "fifth size" bottles of vodka, and she further testified that defendant "drank a fifth every day." However, defendant testified that he was not drinking throughout the day on December 24, that he only had a drink after their friends left, and that DS had consumed three drinks by the time they started arguing. Thus, it appears that there was evidence introduced at trial supporting defendant's contention that he was not intoxicated and that DS's perceptions of his drinking were somewhat unreliable and not credible. Defendant

merely argues that more evidence should have been introduced on this point, making it an even more significant focus.

However, in light of the clear evidence—including defendant's admissions—of the physical assault defendant committed, defendant has not explained how more trial testimony parsing the degree of his intoxication or lack of intoxication, which is not an element of the convicted offense, would have had any reasonable likelihood of changing the verdict. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 US at 693. Defendant also has not provided a sufficient explanation to overcome the strong presumption that his trial counsel's strategic decisions were sound and "within the wide range of reasonable professional assistance." *Id.* at 689. Defendant has not established that his trial counsel was ineffective on this ground.

Next, defendant argues that his trial counsel was ineffective because his trial counsel's closing argument constituted a concession of defendant's guilt on the aggravated domestic assault count, without defendant's consent, by admitting that defendant pushed DS down and threw her down. Defendant's argument implicates the inherent tension between a criminal defendant's individual right to present a defense and the responsibility of the defendant's lawyer for managing tactical aspects of the defense. As the United States Supreme Court has explained:

> An attorney undoubtedly has a duty to consult with the client regarding "important decisions," including questions of overarching defense strategy. That obligation, however, does not require counsel to obtain the defendant's consent to "every tactical decision." But certain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate. A defendant, this Court affirmed, has "the ultimate authority" to determine "whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." Concerning those decisions, an attorney must both consult with the defendant and obtain consent to the recommended course of action. [*Florida v Nixon*, 543 US 175, 187; 125 S Ct 551; 160 L Ed 2d 565 (2004) (citations omitted).]

Thus, although "[t]rial management is the lawyer's province" and "[c]ounsel provides his or her assistance by making decisions such as what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence," a criminal defendant retains the "[a]utonomy to decide that the objective of the defense is to assert innocence." *McCoy v Louisiana*, 584 US 414, 422; 138 S Ct 1500; 200 L Ed 2d 821 (2018) (quotation marks and citation omitted). The distinction is one between "strategic choices about how best to *achieve* a client's objectives" and the "choices about what the client's objectives in fact *are*." *Id*.

Specifically, the decision to enter a guilty plea is of monumental significance, remaining within the ultimate purview of the defendant, because a guilty plea is a *conviction* and "not simply a strategic choice." *Nixon*, 543 US at 187. "By entering a guilty plea, a defendant waives constitutional rights that inhere in a criminal trial, including the right to trial by jury, the protection against self-incrimination, and the right to confront one's accusers." *Id*. Therefore, a criminal defendant's counsel does not have the authority to consent to a guilty plea on behalf of the defendant. *Id*. A "defendant has the right to insist that counsel refrain from admitting guilt"

because it "is the defendant's prerogative, not counsel's, to decide on the objective of his defense." *McCoy*, 584 US at 417.

Here, there is no question that defendant's trial counsel did not enter a guilty plea on defendant's behalf. The issue before this Court is instead more nuanced. Defendant appears to contend that his trial counsel's closing argument amounted to the functional equivalent of a guilty plea to the aggravated domestic assault charge.

In *Nixon*, the defendant's trial counsel made a "strategic decision to concede, at the guilt phase of the trial [in a capital case], the defendant's commission of murder, and to concentrate the defense on establishing, at the penalty phase, cause for sparing the defendant's life." *Nixon*, 543 US at 178. The defendant confessed to police that he had committed the brutal murder, and he described his actions in "graphic detail. *Id*. at 179-180. Overwhelming evidence also corroborated the defendant's version of events. *Id*. at 180.

The attorney appointed to represent the defendant was experienced in capital cases and, after entering a not-guilty plea, commenced his own independent factual investigation that led him to conclude that, in light of the strength of the evidence against the defendant, the only way to save his client's life would be to focus on the penalty phase and "present extensive mitigation evidence centering on [the defendant's] mental instability." *Id*. at 180-181. The attorney "feared that denying [the defendant's] commission of the kidnaping and murder during the guilt phase would compromise [the attorney's] ability to persuade the jury, during the penalty phase, that [the defendant's] conduct was the product of his mental illness." *Id*. at 181. The attorney thus "concluded that the best strategy would be to concede guilt, thereby preserving his credibility in urging leniency during the penalty phase." *Id*.

However, when the attorney tried multiple times to explain this strategy to the defendant, the defendant was unresponsive and did not verbally approve or objected to the proposed strategy. *Id*. The defendant's counsel exercised his professional judgement and decided to implement the concession strategy. *Id*. at 181-182. The Florida Supreme Court viewed this strategy as "the functional equivalent of a guilty plea" and reversed the defendant's convictions because the defendant had not affirmatively and explicitly agreed to his attorney's concession strategy. *Id*. at 186, 188 (quotation marks and citation omitted). The United States Supreme Court, however, reversed the Florida Supreme Court and held:

> [I]n a capital case, counsel must consider in conjunction both the guilt and penalty phases in determining how best to proceed. When counsel informs the defendant of the strategy counsel believes to be in the defendant's best interest and the defendant is unresponsive, counsel's strategic choice is not impeded by any blanket rule demanding the defendant's explicit consent. Instead, if counsel's strategy, given the evidence bearing on the defendant's guilt, satisfies the *Strickland* standard, that is the end of the matter; no tenable claim of ineffective assistance would remain. [*Id*. at 192-193.]

The United States Supreme Court noted that the prosecution was still required at the guilt phase of the defendant's trial to present admissible evidence establishing the elements of the charged crimes and that "a guilty plea is more than a confession which admits that the accused did

various acts" because "it is a stipulation that no proof by the prosecution need be advanced." *Id.* at 188 (quotation marks and citation omitted). The Court further discussed the inherent problems with a contrary strategy of presenting the "logically inconsistent" defense positions of "he didn't do it" at the guilt phase and "he is sorry he did it" at the penalty phase. *Id.* at 191-192 (quotation marks and citation omitted). "In this light," the Court reasoned, "counsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in 'a useless charade.' " *Id.* at 192 (citation omitted).

In contrast, the defendant in *McCoy* "vociferously insisted that he did not engage in the charged acts and adamantly objected to any admission of guilt." *McCoy*, 584 US at 417. Yet, his trial counsel nonetheless proceeded to admit the defendant's guilt to the jury at the guilt phase of the capital proceedings based on counsel's assessment that the evidence was so overwhelming that a death sentence would be unavoidable unless this concession of guilt was made. *Id.* at 418-419. The defendant "testified in his own defense, maintaining his innocence and pressing an alibi difficult to fathom." *Id.* at 420. The United States Supreme Court held:

> [A] defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty. Guaranteeing a defendant the right "to have the *Assistance* of Counsel for *his* defence," the Sixth Amendment so demands. With individual liberty—and, in capital cases, life—at stake, it is the defendant's prerogative, not counsel's, to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt. [*Id.* at 417-418.]

In the present case, defendant's trial counsel's statement did not constitute an explicit expression that the jury should find defendant guilty of the aggravated domestic assault charge. Instead, trial counsel's statements are better understood as acknowledgments of facts to which defendant testified at trial. Although defense counsel admitted at the evidentiary hearing that he did not obtain consent from defendant to concede guilt to the aggravated domestic violence charge, he also explained that he made this argument, remaining consistent with defendant's own admissions in his testimony, to show that DS fabricated the rape allegations because she was upset about having been pushed by defendant.

Defense counsel clearly argued that the evidence did not support finding defendant guilty of the CSC charges, and he apparently was able to convince the jury to agree with him. With respect to the alleged assault, defense counsel made statements that essentially acknowledged and paralleled defendant's admissions in his trial testimony, in which defendant had testified, "I put my arm out and I pushed her away," and "[s]he fell onto the coffee table." However, it is important to note that defense counsel did not expressly concede defendant was guilty of the crime of aggravated domestic assault or somehow argue that the jury should find him guilty of that charge. His argument instead appeared to essentially focus on contesting the more serious CSC charges. The jury acquitted defendant of those charges and only convicted him of the misdemeanor assault charge. See MCL 750.81a(2).

Even in hindsight, the defense strategy pursued by defense counsel was legitimate. See *People v Kusk*, 499 Mich 933, 934; 879 NW2d 253 (2016) ("The defendant's trial counsel pursued a theory focused on arguing the defendant's innocence of the felony charges of felonious assault and felony-firearm. This strategy was successful in that the defendant was acquitted of these offenses and was convicted only of the misdemeanor offense of domestic assault. MCL 750.81(2). This was a legitimate trial strategy."). "[I]t is only a complete concession of defendant's guilt which constitutes ineffective assistance of counsel." *People v Krysztopaniec*, 170 Mich App 588, 596; 429 NW2d 828 (1988).

This Court has also held that "where the evidence obviously points to defendant's guilt, it can be better tactically to admit guilt and assert a defense or to admit guilt on some charges but maintain innocence on others." *People v Matuszak*, 263 Mich App 42, 60; 687 NW2d 342 (2004). See also *People v Wise*, 134 Mich App 82, 98-99; 351 NW2d 255 (1984) ("This tactic of admitting what the evidence strongly demonstrates at the same time as denying other elements or other crimes before the jury is also familiar to this court and we find no error in counsel's use of the tactic.") (quotation marks and citation omitted); *People v Klungle*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 364125); slip op at 2-4, oral argument scheduled on application ___ Mich ___; 20 NW3d 573 (2025) (concluding that the concession by the defendant's trial counsel to the trespassing charge as part of a strategy to maintain credibility before the jury while seeking to prevail against the more serious resisting-or-obstructing-an-officer charges did not amount to a Sixth Amendment violation, reasoning in relevant part that the "defendant's own testimony did not challenge the factual basis for the trespassing charge" because the defendant in his testimony "acknowledged that he, despite the eviction order, and despite receiving the eviction notice, knowingly remained on the property"); *People v Kilgore*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 365881); slip op at 5 ("[I]t is understandable that counsel focused on the more serious charges, and it is even understandable that he conceded defendant's guilt on the CCW charge, as that concession likely garnered him credibility with the jury. In losing the CCW battle, defense counsel may have helped defendant gain the victory on the murder charges.").

Defendant has therefore failed to demonstrate that his trial counsel's performance was objectively unreasonable under prevailing professional norms. *Strickland*, 466 US at 688.

Next, defendant argues that his trial counsel was ineffective for failing to obtain access to defendant's phone as defendant requested. Defendant appears to claim that information on his phone would have further supported his contentions that he was not intoxicated at relevant times and that DS was intoxicated. This being the third time appellate counsel has referred to an issue regarding defendant's level of intoxication at the time the events unfolded, we deem it necessary to inform counsel that defendant's level of intoxication played no significant role in these proceedings. As previously discussed, again, defendant has not demonstrated how establishing these tangential claims would create a reasonable likelihood that the outcome of his trial would have been different. Moreover, he admitted at the evidentiary hearing that there was no information on his phone showing that DS had somehow admitted to fabricating her allegations. Because defendant cannot establish the requisite prejudice, he has failed to show that he is entitled to any relief on this ineffective assistance of counsel claim. *Randolph*, 502 Mich at 9.

Defendant next argues that his trial counsel was ineffective for failing to raise the issue of self-defense and failing to request a self-defense instruction. However, "a defendant does not act

-15-

in justifiable self-defense when he or she uses excessive force or when the defendant is the initial aggressor." *People v Guajardo*, 300 Mich App 26, 35; 832 NW2d 409 (2013). "[U]nderpinning self-defense doctrine is the longstanding principle that a person should use no more force than reasonably appears necessary to repel a threat." *People v Ogilvie*, 341 Mich App 28, 40; 989 NW2d 250 (2022).

Here, although there was evidence that DS pushed or shoved or hit defendant first, he did not claim to have been hurt or injured, nor did he claim that he feared any harm from DS. Yet, even assuming he was entitled to respond with non-deadly force, defendant reacted by using a degree of force against her that the evidence reflects caused serious injuries to DS. Defendant even testified that he was angry and upset when DS pushed him. On this record, consisting of evidence demonstrating that defendant used force well in excess of an amount that could be considered reasonably necessary to repel any threat DS may have prevented, defendant has not shown that there is a reasonable probability that the outcome of his trial would have been different if his trial counsel had raised a self-defense theory, and defendant thus has not shown that he was denied the effective assistance of counsel on this ground. *Randolph*, 502 Mich at 9.

Affirmed.

/s/ Kathleen A. Feeney
/s/ Stephen L. Borrello
/s/ Anica Letica